**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

JANE DOE, L.O.

Plaintiff,                                              CIVIL ACTION NO.

v.

SHEPHERD'S HILL ACADEMY, INC.          **JURY TRIAL DEMANDED**

Defendant.

_____

**COMPLAINT AT LAW**

COMES NOW Plaintiff, Jane Doe, L.O., through the undersigned counsel, and brings this Complaint and Jury Demand (Complaint) for her causes of action and related damages against Defendant Shepherd's Hill Academy, Inc. (hereinafter, "SHA" or Defendant) seeking damages and other relief as the Court deems proper.

## I.  INTRODUCTION

1.      The Troubled Teen Industry ("TTI") is a notorious moniker for a network of residential mental health programs targeting vulnerable teenagers and young adults. TTI programs operate both across the United States and internationally. The industry generates significant revenue but lacks any meaningful regulation or oversight.

1

2.      SHA was a TTI facility purporting to help "troubled" teens until it closed in 2025.

3.      Like other TTI facilities, SHA used sophisticated marketing to prey on teens struggling with mental health issues and their desperate families.

4.      SHA promised teens and their families that teens would receive individualized and industry leading care led by qualified professionals. The reality is that the children who attended SHA spent the vast majority of their time being supervised by untrained and unqualified young adults who were not much older than them.

5.      Instead of the cutting-edge care and therapeutic milieu SHA promised to parents, the children were subjected to months of abuse, neglect, coercion, and forced labor. As a result, the vulnerable children frequently left SHA and other TTI facilities in a far worse condition than when they arrived.

6.      SHA, like other TTI facilities, was an out-of-network provider, leaving parents scrambling to pay out of pocket. Desperate parents are forced to pay upwards of $100,000 a year, or hundreds of dollars per day, in an attempt to help their children.

7.      This case exposes the devastating reality behind these false promises of help and abuse at SHA through the experience of Plaintiff, Liliana Odette.

2

8.    Plaintiff and her parents sought help for her because she was bullied at school by enrolling her for a year at SHA beginning in November 2019.

9.    Like countless other families, Plaintiff and her parents were drawn in by SHA's sophisticated marketing promises of a safe, therapeutic environment staffed by teen mental healthcare experts.

10.    Plaintiff's experience at SHA was nothing like the promises SHA made to her and her parents.

11.    From the moment she arrived at SHA, Plaintiff was abused, neglected, humiliated, physically and sexually assaulted, spiritually coerced, and forced to perform unpaid labor, all while sleeping outside in the elements in nothing more than a tarp on sticks.

12.    Most egregiously, SHA told her all of this was God's will for her, that her illnesses were her fault, that it was too late for her, and that she deserved whatever pain she felt. She was told that to question her conditions, or SHA's prognosis, was to question God.

13.    She endured this traumatizing abuse and neglect for a year while she was just 12-13 years old.

14.    Plaintiff and her parents trusted the representations SHA made to them and relied on SHA's purported expertise in choosing to enroll Plaintiff at SHA and to pay nearly $100,000 to SHA to keep her there for a year.

3

15.     SHA took active steps to prevent Plaintiff from communicating the truth of her circumstances to her parents by delivering harsh punishments whenever Plaintiff attempted to describe the conditions in letters to her parents, then outright refusing to send communications that contained anything negative about SHA.

16.     Plaintiff was just 12-13 years old and she was away from her family. She was trapped in a sophisticatedly coercive environment run on a draconian system of punishments and discipline.

17.     Plaintiff suffered profound and permanent trauma and injuries because of SHA's actions. She still struggles to comprehend the full scope of SHA's betrayal and to see past SHA's systemic brainwashing and psychological manipulation of her.

18.     Plaintiff brings the following causes of action related to her claims and damages as a result of her time at SHA: Violations of TVPRA 18 U.S.C. §§ 1595 and 1584; Violations of TVPRA 18 U.S.C. §§ 1595 and 1589; Violations of TVPRA 18 U.S.C. §§ 1595 and 1590; Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C. §§ 1584, 1589, 1590, 1594 and 1595; Violations of U.S.C. § 2255; Negligence/Gross Negligence; Breach of Fiduciary Duty; Assault and Battery; Georgia State RICO Violations O.C.G.A. § 16-14-4; Premises Liability O.C.G.A. § 51-3-1; Punitive Damages O.C.G.A. § 51-12-5.1; and Attorney's Fees for Bad Faith O.C.G.A. § 13-6-11.

## II. <u>THE PARTIES</u>

1.      Plaintiff is an individual residing in Texas.

2.      Defendant, SHA, is a Georgia corporation with its principal place of business located at 2200 Price Road, Martin, Georgia 30057. SHA may be served with process by serving its registered agent at 2200 Price Road, Martin, Georgia 30057.

## III.   <u>JURISDICTION AND VENUE</u>

3.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims arising from a federal question under 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595(a), and 2255.

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiff and the Defendant, and the amount in controversy in this case exceeds $75,000.00, exclusive of costs and interest.

5.      This Court has general and specific jurisdiction over SHA because its principal place of business is in Georgia and because the claims in this matter arise out of SHA's contacts with Georgia.

6.      Venue is proper in this Court pursuant to O.C.G.A. 9-10-93 and 14-2-510 as SHA resides and maintains a principal office in the Northern District of Georgia.

## IV.    STATEMENT OF FACTS

### A. SHA's Founding and Expansive Marketing Promises

7.    Trace Embry and his wife, Beth Embry, founded SHA as a Christian therapeutic boarding school in 1994, originally calling the facility Shepherd's Hill Farm.

8.    Trace Embry has hosted a podcast called "License to Parent with Trace Embry" and maintained an associated website since at least 2010. He has mentioned SHA on the podcast frequently.

9.    The stated goal of the podcast is to take what is learned at SHA and to export it for listeners so they can "avoid the need for a residential program for your teen."

10.    Trace Embry wrote a book titled "The Miracles of Shepherd's Hill: An Extraordinary Odyssey of Divine Interventions" that promoted SHA. Inspira published the book.

11.    SHA was situated on an 86-acre farm in Martin, Georgia.

12.    SHA began enrolling teens in crisis, or "troubled teens," around 2001.

13.    The Embry's operated SHA as an unlicensed facility until 2010-2011.

14.    A social worker filed a complaint regarding SHA with Georgia's Department of Health and Human Services around 2010-2011.

15.    SHA obtained a license to operate after the social worker's complaint to Georgia's Department of Health and Human Services.

16.    On its website, SHA defined the term "troubled teens" as those who were struggling with the following[1]:

- Digital, internet, video game, cell phone addictions

- ODD (Oppositional Defiant Disorder)

- ADHD (Attention Deficit Hyperactivity Disorder)

- DTD (Developmental Trauma Disorder)

- PTSD (Post Traumatic Stress Disorder)

- Self Harm and cutting

- Depression and anxiety

- High-functioning ASD (formerly called Asperger's)

- Anger, rebellion, and running away

- Narcissism and entitlement issues

- Loss of educational status or motivation (school expulsion or dropping grades)

- Bipolar and borderline personality disorders

- Adoption/attachment issues

---

[1] https://web.archive.org/web/20200831161612/https://www.shepherdshillacademy.org/faqs/

- Other behavioral, conduct, and emotional disorders that are causing problems for the teen's future

- Victims of abuse

- Trauma

17.    SHA's list encompasses such a wide gamut of conditions and personality characteristics that nearly any teen could qualify as a "troubled teen."

18.    SHA marketed that it had "successfully treated a wide range of teen issues and behavioral conditions."

19.    SHA marketed that it treated students using a "unique blend of holistic and evidence-based practices combined with a proven wilderness component."

20.    SHA marketed that it had successfully treated teens with the following conditions:

- Addiction

- ADD

- Anger issues

- Mood disorders – anxiety, depression, and bi-polar disorder

- ODD

- PTSD

- Reactive attachment disorder

- Self harm and suicidal thoughts

- Sexual abuse victims

21.    SHA did not employ a psychiatrist or physician while Plaintiff was enrolled at SHA.

22.    SHA did not employ a psychologist while Plaintiff was SHA.

23.    Several of SHA's "troubled teen" conditions are medical conditions, such as bipolar disorder, for which medication is frequently prescribed to manage chronic symptoms.

24.    SHA marketed that 70% of its students were medication free when they left SHA.

25.    SHA stated that it was not against medication but that in its view psychiatric medications were "grossly abused by the mental health industry these days."

26.    SHA, and specifically Trace Embry, maintained and enforced a policy that disfavored psychiatric medication use.

27.    SHA actively encouraged students, including Plaintiff, to stop taking psychiatric medications "cold turkey," meaning without titration.

28.    SHA students, including Plaintiff, experienced severe withdrawal symptoms because SHA encouraged them to abruptly stop all psychiatric medications.

9

29.    SHA specifically listed other "exclusionary" conditions on its website and stated it could not accept teens with those conditions.

30.    At the time of her enrollment, Plaintiff had none of the "exclusionary conditions."

31.    At the time of her enrollment, Plaintiff was struggling with several of the conditions SHA specifically stated it could successfully treat.

32.    Christy Verna, the then Senior Admissions Coordinator for SHA, told Plaintiff's parents that SHA was "intentionally designed to support long term healing" and that students would be "in a healthy, loving, structured environment."

33.    Mr. and Mrs. Embry, as the founders and directors of SHA, made several representations about SHA:

a.    SHA was based on the "best and latest science"

b.    "SHA's therapeutic environment offers **the highest degree of emotional healing possible**." (emphasis added)

c.    SHA combined science and faith

d.    Being grateful for something would produce "the same amount of serotonin as if a person took one Prozac or one Wellbutrin!"

e.    "nobody at SHA does anything to make kids feel like Jesus is being forced down their throats."

f.    "Every teen is loved and treated with equal respect and dignity."



34.    Trace Embry told SHA students the following:

    a.   that he hated them;

    b.   that their parents had sent them to SHA for a reason;

    c.   that it was too late for them to improve;

    d.   that if they ever became doctors he would never want them to treat him;

    e.   that they were already lost to the demons, meaning it was too late for

        them to improve;

    f.   that demons caused homosexuality and transgenderism;

    g.   that demons caused mental illness.

35.    Trace Embry, and SHA staff, would consistently refer to homosexuals

as "faggots" in front of students, some of whom were openly homosexual.

11

36.    Trace Embry interacted with SHA students on a weekly basis during what SHA called chapel.

37.    During chapel, Trace Embry would play anti-abortion videos to children in which actual abortions were shown.

38.    Mr. Embry would show the students the documentary Hells Bells, stopping the movie every few minutes to instruct the students about its purported lessons.

39.    Trace Embry would point out an LGBTQ artist on screen while playing Hells Bells and tell the students gay thoughts were demonic thoughts and that being gay was a mental illness.

40.    Trace Embry wore shirts printed with anti-gay Bible verses while he taught chapel.

41.    During a class Plaintiff was in at SHA, an SHA staff member threw cotton balls on the ground and suggested the single black student at SHA pick them up after the black student asked about Black History Month.

42.    The SHA Residential Program packet ("Residential Packet") sent to Plaintiff's stated students would live in a "peaceful respite" that was a "constant therapeutic backdrop" in which students would have "access to constant mentorship and curative interaction with our highly trained Residential Staff."

43.    The conditions at SHA for Plaintiff were anything but peaceful or therapeutic.

**B. Horrible and Abusive Conditions at SHA for Plaintiff**

44.    Plaintiff was a student at SHA from approximately November 6, 2019 to November 6, 2020.

45.    Plaintiff was 12-13 while she was at SHA.

46.    During Plaintiff's intake at SHA, an SHA staff member named Josh Temple remained in the room the entire time and turned halfway to the wall while she was naked in the middle of the room.

47.    SHA staff asked her invasive questions about her sexual history.

48.    The only psychological testing she received at intake was a Rorschach inkblot test, which is not a scientifically valid psychological assessment tool.

49.    SHA staff immediately informed Plaintiff that nearly all of her freedoms and basic human rights were in their absolute control.

50.    SHA staff told Plaintiff that she now had limited access to food, water, shelter, clothing, and hygiene, that SHA controlled all of it, and that her access to it all was conditioned on her behavior and compliance with SHA rules and doctrine.

51.    SHA told Plaintiff that she was immediately on "Silence," meaning she could not speak to anyone unless SHA staff approved.

52.     SHA kept Plaintiff on Silence for the entire first month that she was at SHA.

53.     Plaintiff could not leave the sight of SHA staff. This was referred to as being "on hip." This meant that SHA staff watched her use the restroom and shower.

54.     A male staff member named Josh watched her shower and told her she could not be alone or "off hip" while in the shower.

55.     Plaintiff later learned that SHA employed, despite its overt anti-LGBTQ views, several homosexual female staff members who had watched Plaintiff shower and use the restroom.

56.     Plaintiff and other female students were housed in one of two "cabins" as SHA called them.

57.     The cabins were rudimentary log structures that had no insulation, electricity, heating, ventilation, or bathrooms.

58.     The walls and ceilings of the cabins were essentially a large tarp.



59.    The shoddy cabins consistently had leaks with visible mold growth. Water would leak into the cabin each time it rained or snowed.

60.    There were constant infestations of snakes, rodents, and bugs in the cabins.

61.    Plaintiff woke up multiple times to rats burrowing in her hair or bed. She could feel rats tugging at her hair as she tried to go to sleep.

62.    SHA staff named the snakes in an effort to mollify the scared students.

63.    SHA staff only allowed students to use the stove heater in the cabin if the outside temperature fell below 40 degrees Fahrenheit.

64.    Students slept 10-14 per cabin on wooden bunk beds. The bunk beds had been made by prior students. The beds had visible nails sticking out in all directions. Plaintiff's skin, clothes, and blanket would get caught on the nails throughout the night.

65.    Plaintiff was given a sleeping bag that her parents provided and a single blanket. She was never given additional bedding, blankets, or anything else for warmth.

66.    SHA staff told Plaintiff additional blankets would make the cabin look "untidy."

67.    Each night, SHA staff would take Plaintiff's and other students' shoes and pants to discourage them from running away.

68.    SHA staff would put the shoes and pants in a large bin, then barricade the door to the cabin with the bin.

69.    An SHA staff member would also sleep in front of the door.

70.    The cabins were so horrific that students would hope to get COVID because then SHA staff would let them sleep in the classroom on the floor, which was heated and had padded floors.

71.    SHA withheld basic access to medical care.

72.    There were outbreaks of scabies, athletes foot, and lice, and none of them were properly treated.

73.    SHA would force students to stand in a line with their arms spread open and then spray their entire bodies with Lysol for COVID protection.

74.    SHA put students on a strict regimen of food that was prepared in unsanitary conditions.

75.    The facility's kitchen was infested with rats, bugs, and had visible mold on the floors, walls, and in the sink. Dishes were cleaned in brown water.

76.    The kitchen was in a trailer that had multiple holes in the floor.

77.    Students frequently saw rats, bugs, and racoons in the kitchen and through the holes in the floor.

78.    When staff prepared food, it was often undercooked and frequently served on dirty plates. This resulted in students being forced to eat entire meals of frozen chicken and vegetables.

79.    SHA forced students to cook some meals in a large pot over a fire. If students dropped food in the dirt, SHA forced them to clean it off and eat it.

80.    SHA employed a rigid and abusive system of discipline it called "Consequences."

81.    SHA represented to Plaintiff's parents that Consequences were "controlled and intentional" and that discipline was "handled in love and never out of anger."

82.    Consequences were punishments given to SHA students.

83.    SHA staff would dole out Consequences for things like looking the wrong way, talking, not finishing a meal, singing, smiling, not social distancing during COVID, talking about "non-Christian" topics, not being "lady like" or a "girly girl," saying anything negative about SHA, not writing to family, writing the

wrong things to family, refusing to write only positive things about SHA in letters to family, or saying anything about LGBTQ.

84.    Consequences included food restrictions, forced labor, shaming, Silence, and exercise.

85.    Food consequences included limiting food or making a student eat "special meals" that commonly consisted of just a slice of frozen bread or small portions of cold beans with no seasoning.

86.    As a Consequence, SHA forced students to eat special meals for weeks at a time, and to always do so in front of the other students but while sitting alone.

87.    Several students at SHA had eating disorders, despite SHA stating on its website that it could not treat children with eating disorders.

88.    Experts commonly refer to this type of food punishment as promoting eating disorders.

89.    SHA forced students to do thousands of pushups, jumping jacks, squats or other physical punishments for things as simple as speaking out of turn or stating they did not want to eat a plate of frozen chicken.

90.    Plaintiff was kept on Silence for her first month at SHA, being completely forbidden from speaking to anyone without SHA staff permission. She was frequently placed back on Silence for weeks at a time as a Consequence.

91.    SHA staff doled out Consequences arbitrarily.

92.    One former SHA staff member testified that she was told students "could never receive enough consequences" as part of the discipline indoctrination.

93.    SHA staff would use violent restraints, such as tackling and shackling students, or pinning students down. Often it was grown men tackling teenage girls.

94.    SHA staff took "wrestling" classes to learn how to restrain the children.

95.    SHA staff violently restrained Plaintiff at least two times. Both times SHA staff knocked her to the ground, pinned her arms at her side, and kneeled on her back.

96.    SHA staff restrained her in this manner once for throwing a piece of bread.

97.    Students who tried to run would be tackled, shoved into white coats, and thrown into the shower room.

98.    SHA staff told students, including Plaintiff, that SHA would sick the dogs on them if they tried to run.

99.    Plaintiff recalls that most of the girls at SHA were so unhealthy and malnourished that they could not run fast enough to get away.

100.    All of the violence was done in the open, as a threat to all students.

**C. SHA Isolated Then Coerced Plaintiff**

101.    SHA cut off all direct contact between Plaintiff and her family for the first three months she was at SHA.

102.   SHA staff forbid Plaintiff from calling her family for months. She was limited to hand-writing them letters.

103.   Plaintiff wrote dozens of letters to her family during those first few months at SHA.

104.   SHA staff refused to mail any letter that contained what SHA perceived as a negative reference to SHA.

105.   SHA marketed its staff were "equipped to understand different individual diagnoses and treatment approaches."

106.   SHA staff frequently used shame and manipulation to coerce Plaintiff into compliance.

107.   SHA staff would manipulate Plaintiff by telling her things like "you're *really* going to make your parents think this [something negative about SHA, like that she froze the night before in the cabin]" or "you know it isn't this bad here."

108.   SHA staff would make her rewrite letters by removing any negative reference to SHA.

109.   SHA staff told her she was not allowed to send negative letters.

110.   The Residential Packet SHA sent to Plaintiff's parents did not mention that SHA would edit her letters. It stated only that students could write letters "as frequently as they like" and that SHA would mail them out "weekly."

111.    Students who refused to rewrite letters faced two consequences: SHA staff would never mail their letters, so they were completely cut off from family, and SHA staff would give them Consequences.

112.    The end result was that if a student wanted to honestly tell their family they had woken up with a rat nesting in their hair or eaten an entire meal of frozen chicken, that student would be forced to do hundreds of pushups and eat cold canned beans for weeks.

113.    SHA staff told Plaintiff she had to "earn" the right to speak to her parents.

114.    When she finally earned that right months later, SHA staff monitored every phone call.

115.    SHA used religious coercion to manipulate students into accepting its dogma.

116.    SHA discouraged psychiatric treatment, telling Plaintiff that mental illness was just a lack of faith and that ultimately her symptoms were her own fault through choosing distance from God.

117.    SHA forced students to attend religious services, read the Bible, and to listen to and agree with creationism, Adam & Eve, and that modern medicine and science "lacked scientific evidence,"

118.    Mr. and Mrs. Embry mispresent this forced indoctrination of teenagers over the course of a year as a passive process in which they "refuse to jumpstart kids into something only objective truth and the Holy Spirit can do."

119.    SHA was largely operated by young, unqualified staff members, many of whom were in their late teens or early twenties.

120.    SHA staff would openly talk about how they had just started college, meaning they were just a year or two older than students at SHA.

121.    Mr. Embry has no formal mental health training, licensing, or credentials.

**D. SHA Subjected Plaintiff to Forced Labor for a Year**

122.    SHA forced Plaintiff to perform labor everyday she was at SHA.

123.    Plaintiff was only 12-13-years-old while at SHA.

124.    Her forced labor included the following;

    a.  Cleaning the moldy floors and walls of the kitchen with a toothbrush;

    b.  Cleaning class rooms;

    c.  Cooking food for herself and other students;

    d.  Scrubbing the shower facilities with a toothbrush and comet, without gloves or a mask;

    e.  Landscaping SHA's property – cutting grass with clippers, trimming hedges, doing even more work before parental visits;

    f.  Cleaning out dead rats, bugs, and removing snake skins from under the cabin Plaintiff slept in;

    g.  Cutting down trees, debarking the trees, digging holes with a fencepost, then constructing a fence to keep SHA farm animals from escaping;

    h.  Cutting down and debarking trees to build cabins and other structures on SHA property;

    i.  Chopping firewood;

    j.  Hoeing dirt, planting crops, watering and tending to the crops, then harvesting the crops;

    k.  Landscaping SHA's property;

    l.  Spending a month deep cleaning and landscaping SHA before a parents' weekend at SHA;

    m. Hauling water every morning up a hill then watering SHA's goats, chickens, and pigs;

    n.  Grooming SHA horses and cleaning SHA stables;

    o.  Bottle feeding goat babies;

    p.  Make, haul, and dispense pig slop to SHA pigs;

    q.  Sewing and making COVID masks for at least an hour every day that SHA used and/or sold off-campus – Plaintiff or other SHA students did not use the masks.

125.    SHA forced Plaintiff to perform the above unpaid labor for at least four hours every weekday and at least six hours each day on the weekends.

126.    SHA required Plaintiff to perform at least 32 hours of unpaid and forced manual labor for each of the 52 weeks she was at SHA.

127.    Plaintiff's labor was not voluntary.

128.    SHA threatened Plaintiff with Consequences and gave her Consequences for her even mentioning she may not want to perform the unpaid labor or for performing it in a manner that was unsatisfactory to SHA staff.

129.    Plaintiff had no control over her work schedule, the work she did, or the conditions in which she performed the work for SHA.

130.    SHA never provided Plaintiff with any safety gear, instructions for safety, or training for any of the unpaid manual labor she performed.

131.    Plaintiff performed unpaid labor in freezing cold and sweltering heat, in rain and in snow.

132.    SHA never paid Plaintiff or her parents for Plaintiff's forced labor.

**E.  SHA's Education and Therapy Was Not as Promised**

133.    SHA promised Plaintiff and her family that Plaintiff would receive at least three hours of therapy every week - an hour each of individual, group, and equine therapy.

134.   Plaintiff's individual therapy was consistently cancelled as staff would have COVID or there would be other restrictions. She often went for weeks without an appointment.

135.   Plaintiff's counselor similarly downplayed her concerns about SHA and manipulated into believing her conditions at SHA were therapeutic and helpful.

136.   Plaintiff's therapist at SHA was a mandatory reporter of child abuse.

137.   Plaintiff's therapist at SHA never reported Plaintiff's abuse at SHA to the appropriate authorities.

138.   SHA marketed the group sessions as "a safe, controlled space without fear of condemnation or judgment" in which group leaders would guide students "in how to accept one another."

139.   SHA stated the group sessions would give "students more peer experience and understanding of others in the group as they learn to build healthy relationships."

140.   Plaintiff's group therapy alternated between forced yoga sessions during which she was slathered with "healing" oils while being told the oils would bring her closer to God and forced personal confessional stories in front of dozens of other students.

141.    During one group session, another student was forced to recount a prior church shooting in which her family members were killed. The experience traumatized the student and horrified Plaintiff and the other students.

142.    SHA staff routinely shamed students during group sessions.

143.    Students who admitted to being gay or told the group of a gay sexual experience were told by SHA staff to not do "faggoty things" or simply called "faggots" in front of the group.

144.    Students were made to recount instances of sexual abuse, then told it was their fault and shamed as sinful.

145.    The abuse and humiliation of group sessions left Plaintiff in a constant state of vulnerable fear and hypervigilance.

146.    SHA staff would pass out their phone numbers and social media contacts to minor students at SHA. Plaintiff knows of adult staff that befriended and communicated with minors after they left SHA.

147.    SHA staff friended Plaintiff on social media after she left SHA and posted/commented on her posts.

148.    The educational program at SHA did not provide Plaintiff with the instruction or credits SHA promised her family.

149.    SHA marketed its educational programs as combining "high academic standards" and that the educators were "dedicated to helping your child succeed academically."

150.    Students aged 12-18 were all taught in one class.

151.    Only a small group of students who were 18-19 were allowed specialized instruction in a smaller room apart from the other students.

152.    Subjects were taught to the group as a whole, such that students aged 12-18 were taught the same math, science, English, and history lessons.

153.    Plaintiff did not receive individualized instruction, nor did she receive age-appropriate instruction, as she would have in most any other school.

154.    Most of Plaintiff's SHA credits did not transfer to the schools she attended after SHA.

155.    SHA charged Plaintiff's parents $96,000 for her year at SHA.

156.    SHA engaged in fraudulent billing practices related to insurance, health savings accounts, and education funding accounts.

157.    SHA fraudulently billed parents for additional charges and fees related to punitive discipline it enforced against students.

**F.  Plaintiff Suffered Severe and Permanent Injuries Because of SHA**

158.    SHA did not offer or provide the therapeutic services it marketed and promised to Plaintiff and her family.

27

159.    Plaintiff developed permanent physical and mental injuries as a direct result of SHA's abuse and neglect.

160.    Plaintiff's return from SHA was marred with severe unhappiness and a complete inability to socialize or to merge back with society.

161.    Plaintiff slept on the floor near a window for months, and could not take hot showers.

162.    Plaintiff's depression and anxiety changed into severe and disabling conditions.

## V. CAUSES OF ACTION

### COUNT ONE

### Violations of TVPRA  18 U.S.C. §§ 1595 and 1584

163.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

164.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

165.    Plaintiff was a victim of forced labor trafficking in violation of 18 U.S.C. § 1584.

166.    Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude.

167.    Defendant knowingly and willfully held Plaintiff in involuntary servitude in several ways, including but not limited to the following:

a.  Creating and maintaining a system wherein Plaintiff and all other SHA students were forced to work against their will;

b.  Requiring Plaintiff and other trafficking victims to work excessive hours every day in all weather conditions;

c.  Deliberately structuring and conspiring to structure non-profit work and volunteer programs to evade labor and tax laws while obtaining the benefits of the labor of Plaintiff and other trafficking victims;

d.  Retaining the financial proceeds from Plaintiff's labor and that of other trafficking victims while providing Plaintiff or other survivors with no compensation;

e.  Maintaining complete control over Plaintiff and other survivors throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

29

    f.  Maintaining complete control over Plaintiff and other survivors' living conditions, food, and hygiene and expressly conditioning access to them on compliance;

    g.  Providing unsafe and unsanitary living conditions that further weakened Plaintiff's and other survivors' physical and psychological wellbeing, increasing their vulnerability and dependence on Defendant.

168.  Defendant received financial benefit from the forced labor of Plaintiff and other survivors in violation of 18 U.S.C. § 1584.

169.  SHA saved money by using unpaid labor to maintain SHA, to care for SHA's livestock, to plant and harvest crops that SHA students ate, and to build structures on SHA's property.

170.  Plaintiff suffered damages as a result of Defendant's conduct.

171.  SHA received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and held them in involuntary servitude under the guise of helping the children with their mental health struggles.

172.  Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT TWO

### Violations of TVPRA  18 U.S.C. §§ 1595 and 1589

173.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

174.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq.*

175.    Plaintiff was a victim of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

176.    Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

177.    Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which

31

has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

178.    Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

179.    SHA violated 18 U.S.C. § 1589 because SHA obtained Plaintiff's and other survivors' labor through extreme emotional abuse, serious harm in the way of malnutrition, deprivation, psychological harm, physical harm, force, and threats of serious harm.

180.    SHA further violated 18 U.S.C. § 1589 by employing a systemic discipline system it called Consequence as a scheme to cause Plaintiff and other survivors to rightly believe they would be subjected to serious harm if they refused to work.

181.    SHA violated 18 U.S.C. § 1589 in several ways, including but not limited to the following:

a.   Threating to restrict and restricting Plaintiff's access to food, water, and housing if she did not comply;

b.   Threatening to restrict and restricting Plaintiff's access to communication with her family if she did not comply;

    c.  Physically harming students who tried to run or resist in front of Plaintiff and other survivors;

    d.  Threatening Plaintiff with Consequences, that included forced labor, forced exercise, and psychological punishment if she did not performed unpaid labor;

    e.  Physically restraining Plaintiff twice when she did not comply with SHA's demands;

    f.  Shaming students who did not comply in front of Plaintiff and other survivors;

    g.  Threating to restrict and restricting Plaintiff's ability to speak if she did not comply.

182.    SHA profited financially through these violations, and, as such, is liable under 18 U.S.C. §§ 1589(b), 1595(a).

183.    SHA knowingly received a financial benefit from its violations of the TVPRA by receiving unpaid labor and services that benefited SHA.

184.    SHA saved money by using unpaid labor to maintain SHA, to care for SHA's livestock, and to build structures on SHA's property.

185.    Plaintiff suffered damages as a result of Defendant's conduct.

186.    SHA received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and obtained the

children's labor through serious harm and threats of serious harm under the guise of helping the children with their mental health struggles.

187.    Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT THREE

### Violations of TVPRA  18 U.S.C. §§ 1595 and 1590

188.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

189.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

190.    SHA benefited from a venture in which Plaintiff was recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

191.    Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

34

192.   SHA violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

    a.  Creating and disseminating misleading marketing materials that advertised SHA as offering legitimate industry leading educational and therapeutic services to recruit Plaintiff and other survivors;

    b.  Making misrepresentations regarding living conditions when in reality students were housed in overcrowded, moldy, infested, and structurally unsafe facilities;

    c.  Misrepresenting that forced agricultural work would be therapeutic and voluntary;

    d.  Specifically targeting vulnerable children and their desperate families, including teens struggling with addiction and severe psychiatric conditions;

    e.  Using religious and spiritual appeals to induce compliance and promising spiritual growth and fulfillment while concealing the exploitative labor practices;

    f.  Housing Plaintiff and other survivors at all relevant times during which all violations occurred;

g.  Housing Plaintiff and other survivors in unsafe, unsanitary, and overcrowded conditions;

h.  Providing housing infested with bugs, rats, and other pests that caused physical harm to Plaintiff;

i.  Creating living conditions that weakened Plaintiff and other survivors physically and psychologically, thereby increasing vulnerability to exploitation;

j.  Controlling all aspects of Plaintiff's communication with the outside world and editing her letters to remove any negative mention of SHA or the forced labor;

k.  Coercing Plaintiff and other survivors to provide labor through comprehensive physical, psychological, and spiritual means;

l.  Monitoring and controlling Plaintiff's and other survivors' behavior during work events to ensure continued compliance.

193.  SHA knowingly received a financial benefit from its violations of the TVPRA by receiving unpaid labor and services that benefited SHA.

194.  SHA saved money by using unpaid labor to maintain SHA, to care for SHA's livestock, and to build structures on SHA's property.

195.  Plaintiff suffered damages as result of SHA's conduct.

196.    SHA received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and forced those children into unpaid labor under the guise of helping the children with their mental health struggles.

197.    Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FOUR

**Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C. §§ 1584, 1589, 1590, 1594, and 1595**

198.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

199.    While, as alleged above, SHA violated 18 U.S.C. §§ 1584, 1589, and 1590, in the alternative, SHA is liable because it attempted to and did conspire to violate 18 U.S.C. §§ 1584, 1589, and 1590.

200.    The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiff against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

201.    Under 18 U.S.C. § 1594(a)(b) whoever attempts or conspires to violate §§ 1584, 1589, or 1590 shall be punished in the same manner as a completed violation of each section.

202.    SHA intended to violate, took the necessary steps to violate, and conspired to violate 18 U.S.C. §§ 1584, 1589, and 1590, as more fully alleged above.

203.    Plaintiff suffered damages as a result of the conduct of SHA.

204.    Plaintiff is entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FIVE

## VIOLATIONS OF U.S.C. § 2255

205.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

206.    The Child Abuse Victims' Rights Act (18 U.S.C. § 2255) creates a civil remedy for minors who suffer personal injuries as a result of certain federal crimes, including forced labor under 18 U.S.C. §§ 1589 and 1590.

207.    Plaintiff was a minor at all times while SHA forced her into unpaid labor.

208.    Plaintiff suffered personal injuries, as described herein, as a result of SHA's TVPRA violations.

209.    Plaintiff incorporates by reference all arguments and allegations contained herein regarding her forced labor at SHA and SHA's conduct that violated several sections of the TVPRA as to Plaintiff.

210.    Under 18 U.S.C. § 2255, SHA's TVPRA violations entitle Plaintiff to recover the following: actual damages, liquidated damages in the amount of $150,000, attorney's fees, costs of litigation, punitive damages, and all other equitable relief as the court determines to be appropriate.

## COUNT SIX

### Negligence/Gross Negligence

211.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

212.    SHA specifically marketed its services and experience and invited residents with emotional issues to its therapeutic residential program, including Plaintiff, who was an invitee and a minor.

213.    SHA held itself out to Plaintiff and her family as an industry leader and expert in the field of teen mental healthcare.

214.    SHA assumed a duty of care for Plaintiff when it took exclusive control and custody of Plaintiff.

215.    SHA ordinarily had a duty to exercise reasonable prudence and foresight in operating its facility.

39

216. The risk of danger for SHA and Plaintiff was unusually high, as SHA was responsible for caring for children with depression and other severe mental health issues on an isolated sprawling farm.

217. At all relevant times, Defendant owed various duties of care to Plaintiff, which include but are not limited to the following;

   a. A duty to exercise ordinary care in keeping the premises safe for invitees under O.G.C.A. § 51-3-1;

   b. A duty to protect its residents from sexual, physical, spiritual, and mental abuse; battery and assault; as well as other forms of medical, nutritional, and physical deprivation and neglect;

   c. A duty to provide reasonably safe living conditions, including habitable housing, safe and non-spoiled food, and access to medical care;

   d. A duty to exercise reasonable care in the operation and presentation of its educational and therapeutic programs;

   e. A duty to not force Plaintiff into unpaid manual labor;

   f. A duty to exercise reasonable care in supervising Plaintiff and other survivors while they were performing labor for SHA;

   g. A duty to provide accurate and truthful information about the nature and quality of its services and programs;

40

h. A duty to provide appropriate and promised services to residents, including Plaintiff;

i. A duty to properly vet, hire, supervise, and monitor employees, staff, volunteers, and other individuals with access to Plaintiff;

j. A duty to respond appropriately and to investigate reports or suspicions of abuse, misconduct, or unsafe conditions for Plaintiff and other minor students pursuant to O.C.G.A. § 19-7-5, *et. seq.*

218. SHA breached its duties to Plaintiff through several actions, which include but are not limited to the following:

a. Adopting and following policies and procedures that created an unsafe and untherapeutic environment, which was in direct contradiction to the safe and therapeutic environment SHA promised to Plaintiff and her family;

b. Denying outside medical treatment to Plaintiff and other students when they were sick;

c. Failing to isolate and treat illness or to prevent the spread of illness on campus;

d. Encouraging Plaintiff to stop her psychiatric medications through telling her that mental illness was caused by demons;

41

e.  Shaming Plaintiff and other students in front her to obtain Plaintiff's compliance;

f.  Employing punitive measures through Compliance, humiliation, and other excessive disciplinary tactics to break down Plaintiff's psyche and to obtain her compliance with SHA's doctrine and forced labor;

g.  Utilizing a substandard curriculum taught at the same level for all girls ages 12-17;

h.  Failing to ensure and monitor Plaintiff's academic progress;

i.  Prioritizing unpaid manual labor over Plaintiff's educational and psychological development;

j.  Forcing Plaintiff to eat contaminated, ruined, and uncooked food that posed serious health risks;

k.  Creating an atmosphere of fear and hostility that relied on dehumanization and shaming;

l.  Completely restricting and controlling Plaintiff's contact with the outside world and disallowing her to voice concern about her conditions and treatment at SHA;

m. Failing to report SHA's active abuse of Plaintiff, as a child, to the appropriate authorities;

n. Depriving Plaintiff of adequate food, shelter, water, warmth, hygiene, and clothing at times;

o. Authorizing excessive force and restraint against Plaintiff;

p. Publicly using excessive force, restraint, and punishment against other students in front of Plaintiff as a threat mechanism;

q. Employing underqualified, unlicensed staff to provide mental health treatment;

r. Representing that all staff were qualified when they were not;

s. Failing to supervise, monitor, and employ adequately trained and skilled staff to monitor and take care of Plaintiff;

t. Failing to adequately supervise and instruct staff on the use of excessive punishment and abuse;

u. Continuing to employ staff with a known history of abuse, intentional infliction of emotional distress, and violence towards Plaintiff and other students;

v. Failing to act as a reasonable person would to protect Plaintiff and to ensure her psychological well-being was protected;

w. Inflicting severe emotional distress on Plaintiff through its neglect and abuse.

219. It was foreseeable to SHA that its inadequate policies and procedures, its complete prioritization of forced unpaid labor over therapy or education, its lack of appropriate supervision and training of employees, its failure to accurately assess its employees' skills or the effectiveness of the services provided to children, including Plaintiff, and its failure to systemically address the harmful and abusive environment in which it required Plaintiff to live for a year would cause its students, including Plaintiff, to suffer inexcusable physical and psychological harm.

220. SHA's actions and inactions were the proximate cause of Plaintiff's injuries, causing her to suffer grievous bodily injury, severe anxiety, depression, PTSD, loss of faith, and has robbed her of the ability to trust mental healthcare provides, which has left her in a constant state of hypervigilance, anxiety, depression, self-hatred, loathing, emotional pain, and suffering.

221. As a direct and proximate result of SHA's negligent acts, Plaintiff has been catastrophically injured, suffered physical injuries, and sustained permanent and severe emotional distress.

222.  Plaintiff is entitled to recovery compensatory damages and punitive from SHA for all injuries proximately caused by its negligence.

## COUNT SEVEN

### BREACH OF FIDUCIARY DUTY

223.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

224.  SHA stood in a fiduciary relationship to Plaintiff who was a minor entrusted to their exclusive care, supervision, and control for an entire year.

225.  The fiduciary relationship between Plaintiff and SHA arose because SHA served as temporary custodian and caregiver for its minor students, including Plaintiff, standing in loco parentis, with complete control over Plaintiff and the other students' living situations, food, shelter, clothing, and their mental, physical, and spiritual well-being.

226.  As fiduciaries, SHA owed Plaintiff duties of utmost good faith,  care, loyalty, full disclosure, and care that required them to place Plaintiff's interests above its own.

227.  Plaintiff was a particularly vulnerable child with a history of struggling with mental illness at all times while at SHA.

228.  SHA manipulated Plaintiff's vulnerability and created and maintained her total dependence and compliance and used both as a coercive tool to keep

Plaintiff at SHA, working for their financial benefit, and to keep her from questioning her circumstances.

229.    SHA exercised complete control over Plaintiff's ability and desire to leave the program and thus ensured its continuing control over her through emotional, spiritual, and religious manipulation; false statements; discipline; violence; threats; and controlling, monitoring, and editing all of her communications with her family.

230.    SHA breached their fiduciary duties to Plaintiff in several ways, including, but not limited to the following:

    a.  Mispresenting the nature, quality, and safety of the programs and services offered by SHA when they knew, or at least should have known, those representations to be false;

    b.  Exploiting their position of trust, confidence, and authority to coerce Plaintiff into providing uncompensated labor;

    c.  Using their acquired spiritual authority to manipulate and control Plaintiff through fear, shame, and religious coercion;

    d.  Placing their own financial interests above Plaintiff's welfare by providing unsafe housing, contaminated and unsafe food, and inadequate medical care;

46

e. Abusing their position of trust to subject Plaintiff to public humiliation, extreme emotional distress, physical injury, sexual assault, sexual harassment, and other forms of mental and physical abuse;

f. Failing to act in good faith by employing unqualified staff who lacked competence to provide therapeutic treatment;

g. Failing to provide Plaintiff with an adequate education curriculum, prioritizing unpaid labor over her academic progress against her interests;

h. Failing to provide Plaintiff with an adequate therapeutic regimen, prioritizing unpaid labor over her therapeutic progress and emotional well-being against her interests; and

i. Demonstrated repeated deliberate indifference to Plaintiff's medical needs, and withholding treatment and/or encouraging her to forego treatment based on SHA's religious convictions – all of which was against her interests.

231. SHA's breach of their fiduciary duties to Plaintiff was intentional, premediated, wanton, and with extreme disregard to Plaintiff's wellbeing.

232.  Plaintiff completely relied on SHA's misrepresentations, fraudulent statements, threats, and religious/spiritual coercion and manipulation to her detriment.

233.  SHA's actions amounted to bad faith and disloyalty, putting SHA's interests ahead of Plaintiff's.

234.  SHA had a fiduciary duty to make full disclosure of all material facts to Plaintiff and her parents, which it refused to do regarding its disciplinary practices, forced labor, underqualified staff, inadequate therapeutic and educational services, and substandard conditions.

235.  SHA actively mislead Plaintiff and her parents about all materials facts related to its disciplinary practices, forced labor, underqualified staff, inadequate therapeutic and educational services, and substandard conditions, and actively prevented Plaintiff from accurately describing all of it to her parents by editing her letters and refusing to mail letters with accurate but negative facts about SHA.

236.  As a direct and proximate result of SHA's breach of its fiduciary duties, Plaintiff suffered and continues to suffer physical, financial, and emotional injuries.

237.  SHA is liable for actual and compensatory damages, as well as punitive damages where it actions demonstrated, as it did through Plaintiff's time at SHA, willful misconduct and a conscious disregard for Plaintiff's welfare.

## COUNT EIGHT

### ASSAULT AND BATTERY

238.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

239.   Plaintiff was subjected to numerous instances of unwanted and non-consensual physical contact, and threat of unwanted and non-consensual contact, but SHA staff during her enrollment at SHA.

240.   This physical contact was intended to cause harm and offense to Plaintiff.

241.   Specific instances of unwanted and harmful contact of Plaintiff while at SHA include but are not limited to the following:

    a.   Arranging and allowing for her forcible and unwanted transport from her home to SHA;

    b.   Forcibly strip searching Plaintiff against her will while a male remained in the room;

    c.   Physically restraining Plaintiff through use of restraint holds and prohibiting her movement through discipline and Consequence;

    d.   Subjecting Plaintiff to unwanted and excessive exercise, such as forcing her do hundreds of pushups or jumping jacks, as punishment;

e.   Forcing Plaintiff to perform unpaid labor like chopping and barking wood, digging holes, making and hauling pig slop, and caring for livestock.

242.   Plaintiff did not provide consent for any of these unwanted physical contacts.

243.   As a minor, Plaintiff lacked legal capacity to provide consent.

244.   SHA also threatened physical harm to Plaintiff through using excessive violence, restraint, and physical punishment against other students in front of Plaintiff.

245.   SHA's violence against other students caused Plaintiff to believe and fear that she would immediately receive the same violence and physical punishment. This happened repeatedly while Plaintiff was at SHA.

246.   The physical contact and assault by SHA caused Plaintiff to suffer physical injuries, severe emotional distress, anxiety, humiliation, shame, and permanent physical and mental pain and suffering.

247.   As a direct and proximate result of SHA's assault and battery of Plaintiff, Plaintiff has incurred medical expenses, counseling costs, and related economic damages and lost wages.

248.    SHA's conduct was malicious, it was intentional, and it was done with complete disregard for Plaintiff's well-being, a vulnerable minor in its exclusive control and custody, such behavior entitles Plaintiff to punitive damages.

## COUNT NINE

## GEORGIA STATE RICO VIOLATIONS
## O.C.G.A. § 16-14-4

249.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

250.    The Georgia RICO act prohibits any person from participating in an enterprise through a pattern of racketeering activity involving predicate criminal acts.

251.    SHA was an enterprise under Georgia RICO because SHA conducted its affairs through a continuous organizational structure with associates, employees, and other businesses.

252.    The enterprise included, but was not limited to, Trace Embry; SHA employees and contract employees; affiliated professionals like psychiatrists who were not on staff but appeared as service providers in SHA's promotional materials; the podcast company License to Parent with Trace Embry, which frequently promoted SHA and Trace Embry's book, "The Miracle of Shepherd's Hill: An

Extraordinary Odyssey of Divine Interventions;" and Inspria, the publisher of "The Miracle of Shepherd's Hill: An Extraordinary Odyssey of Divine Interventions."

253.   All entities in the enterprise engaged in and profited from a pattern of racketeering activity involving numerous felonies under both Georgia and federal law.

254.   These predicate acts included but are not limited to the following

a. False imprisonment (O.C.G.A. § 16-5-41) by unlawfully restraining students' personal liberty;

b. Cruelty to children (O.C.G.A. § 16-5-70) through excessive physical/mental pain; physical and mental abuse; coercion; threats of physical mental pain; forced labor; spiritual abuse; and through allowing cruel and punitive treatment;

c. Assault and battery of minors (O.C.G.A. §§ 16-5-20, 16-5-23)

d. Deceptive business practices and fraud (O.C.G.A. § 16-9-50, *et. seq.* through false marketing and misrepresentations;

e. Insurance fraud and inflating charges for services not rendered (O.C.G.A. § 33-1-9);

f. Trafficking a person for labor or servitude (O.C.G.A. § 16-5-46) through knowingly recruiting minor students, including Plaintiff, then housing them for the purpose of labor servitude;

g. Trafficking a person for labor or servitude in violation of the TVPRA (18 U.S.C. §§ 1584, 1589, 1590, 1595);

h. Attempting or conspiring to traffic a person for labor or servitude in violation of the TVPRA (18 U.S.C. §§ 1584, 1589, 1590, 1594, 1595);

i. Using the mail and wires to send false information about billing, tuition, educational services, mental health services, insurance reimbursement, or federal funds for educational services (18 U.S.C. §§ 1341, 1343).

255.   This pattern of racketeering activity directly and proximately caused harm and injuries to Plaintiff, including financial harm from the fraud, deceptive practices, and forced labor.

256.   SHA and its associates exhibited the specific statutory intent to engage in these predicate offenses through their actions, threats, acts of deception, and knowing code of silence.

## COUNT TEN

### PREMISES LIABILITY
### O.C.G.A. § 51-3-1

257.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

258.   SHA was the exclusive owner, operator, and manager of the residential premises where SHA was located.

259.   SHA owed a duty of care to students like Plaintiff to exercise ordinary care in keeping the premises reasonably safe from foreseeable hazards and dangers.

260.   SHA breached this duty in several ways by systemically allowing and maintaining unsafe and hazardous conditions to exists on the premises, including but not limited to the following:

a.   Substandard and poorly constructed housing shelters that lacked proper insulation, ventilation, utilities, and allowed for infestations of mold, rodents, insects, and bugs;

b.   Unsanitary food preparation areas that were uncovered, unhygienic, covered in mold, and created substantial risk of illness;

c.   Lack of adequate safety equipment, railing/guardrails, signage, lighting, and other precautions;

d.   Lack of adequate safety equipment, masks, gloves, safety instructions, training, oversight, instruction, or other safety measures for minor girls being forced to perform manual labor and to care for livestock.

261.   SHA knew or reasonably should have known about the hazards on its premises.

262.   SHA actively required that students, including Plaintiff, engage with these hazards on a daily basis, including in unsafe or extreme weather conditions.

263.   SHA had actual knowledge of injury-causing hazards through incident

54

reports, direct staff observations, and student reports in the years SHA was in operation before Plaintiff arrived at SHA, and then while Plaintiff was at SHA, yet SHA failed to take any action to remedy the hazardous conditions.

264.   As a resident student living on-site, that SHA actively recruited and transported to SHA, Plaintiff was lawfully present on the premises as an invitee of SHA at all relevant times.

265.   SHA owed Plaintiff a duty of reasonable care at all times while she was on the SHA premises.

266.   As a minor under SHA's control and custody, Plaintiff belonged to a class of persons requiring a heightened duty of care.

267.   Plaintiff suffered actual physical injuries and emotional distress proximately caused by SHA's failure to fix, remedy, or warn of the hazardous conditions.

268.   Plaintiff's injuries included illness and rashes by exposure to elements, food illness, bites and scratches from bugs and vermin, physical injuries from forced labor without protection, and substantial emotional damage from being exposed, continuously, to these conditions for a year while a child.

269.   SHA's failure to remedy the hazardous conditions along with its forcibly requiring vulnerable children to engage with and live in the conditions demonstrates intentionally harmful conduct entitling Plaintiff to punitive damages.

55

## COUNT ELEVEN

## PUNITIVE DAMAGES
### O.C.G.A. § 51-12-5.1

270.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

271.   Plaintiff seeks punitive damages pursuant to O.C.G.A. § 51-12-14.

272.   SHA's actions as described herein demonstrate systemic and continuous willful misconduct, malice, fraud, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference to Plaintiff's well-being.

273.   SHA's conduct warranting punitive damages includes but is not limited to the following

    a.  Knowingly subjecting Plaintiff, a minor, to cruel and inhumane treatment, including forced labor, excessive physical discipline, and deprivation of basic necessities;

    b.  Deliberately ignoring Plaintiff's medical needs and actively working to convince her, a 13-14 year old girl, that her psychological condition and psychiatric needs were her own fault and somehow simultaneously demonic;

56

c.  Willfully employing unqualified staff and refusing to train or monitor them and allowing them to administer mental health treatment to a minor, showing deliberate disregard for Plaintiff's well-being;

d.  Forcing Plaintiff, a minor, to engage in manual unpaid labor for hours every day for an entire year;

e.  Consciously disregarding the safety of children, including Plaintiff, by forcing them to live in dangerous, moldy, infested housing without insulation, ventilation, or bathroom facilities;

f.  Intentionally limiting Plaintiff's ability to ask her parents for help, or to tell them of her conditions and treatment while at SHA, and deliberately isolating her from her family to induce reliance and compliance;

g.  Engaging in fraudulent representations to induce Plaintiff's enrollment, continuing enrollment, and payments from Plaintiff's parents.

274.  These actions demonstrate a systemic pattern and practice of deliberate action intended to harm Plaintiff and such actions go far beyond mere negligence due to their pervasiveness and willfulness.

275.  Punitive damages are warranted to punish SHA for its egregious conduct and to deter others from engaging in similar conduct with respect to children and their vulnerable families.

## COUNT TWELVE

### ATTORNEY'S FEES FOR BAD FAITH
### O.C.G.A. § 13-6-11

276.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

277.    O.C.G.A. § 13-6-11 allows for an award of attorney's fees and expenses of litigation where the defendant has acted in bad faith, been stubbornly litigious, or caused the plaintiff unnecessary trouble and expense.

278.    SHA has acted in bad faith in the transactions and occurrences giving rise to these claims.

279.    SHA's bad faith includes but is not limited to the following:

a.      Knowingly misrepresenting the nature of SHA's program and services to induce payment, enrollment, and continuing payment and enrollment;

b.      Deliberately violating state regulations and standards of care for residential treatment facilities for minors;

c.      Intentionally subjecting Plaintiff to abusive and harmful practices under the guise of treatment;

d.      Willfully disregarding Plaintiff's physical and mental health needs;

58

    e.    Purposefully restricting Plaintiff's communications with her parents to conceal the abuse and true nature of SHA's programs and services;

    f.    Forcing Plaintiff to perform unpaid manual labor for hours every day for a year;

280.   These actions are all deliberate and they all demonstrate SHA's bad faith towards Plaintiff.

281.   SHA's bad faith has caused Plaintiff unnecessary trouble and expense, including incurring significant medical expenses and now having to pursue litigation to seek redress.

282.   Plaintiff seeks an award that includes all expenses of litigation and reasonable attorney's fees that are incurred as a result of SHA's bad faith actions.

## VI.   <u>JURY TRIAL</u>

283.   Plaintiff demands a jury trial on all issues.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief as follows:

    A. That process issue according to law;

    B. That Defendant be served with a copy of Plaintiff's Complaint and show cause why the prayers for relief requested by Plaintiff herein

should not be granted;

C.  That the Plaintiff be granted trial by jury;

D.  That the Court enters judgment against Defendant for all general and compensatory damages allowable to Plaintiff;

E.  That the Court enters judgment against Defendant for all special damages allowable to Plaintiff;

F.  That the Court enters a judgment against Defendant serving to award Plaintiff punitive damages under the provisions of O.C.G.A. § 51-12-5.1;

G.  That the Court enters a judgment against Defendant serving to award Plaintiff costs of litigation and reasonable attorney's fees under the provisions of O.C.G.A. § 13-6-11;

H.  That Plaintiff recovers all possible damages for loss of consortium;

I.  That Plaintiff recovers all possible damages for Plaintiff's injuries and pain and suffering;

J.  That the Court enters judgment against Defendant for all other relief sought by Plaintiff under this Complaint;

K.  That the cost of these actions be cast upon Defendant;

L.  That the Court grant Plaintiff such further relief which the Court

deems just and proper.

Dated: December 15, 2025

Respectfully submitted,


/s/: Mitchell E. McGough
Mitchell E. McGough, Esq.
Georgia Bar No. 460942
Mitchell E. McGough Law, LLC
945 E. Paces Ferry Rd NE, Ste 2250
Atlanta, Georgia 30326
mitchell@mitchellmcgoughlaw.com
*Counsel for Plaintiff*


Kelly Guagenty, Esq. (*pro hac vice to be filed*)
Keith Smith, Esq. (*pro hac vice to be filed*)
Justice Law Collaborative, LLC
210 Washington St.
North Easton, MA 02356
(508) 230-2700
kelly@justicelc.com
keith@justicelc.com
*Counsel For Plaintiff*

61

## **CERTIFICATE OF COMPLIANCE**

Under Local Rules 5.l (C) and 7.l (D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

/s/: Mitchell E. McGough
Mitchell E. McGough, Esq.
Georgia Bar No. 460942
Mitchell E. McGough Law, LLC
945 E. Paces Ferry Rd NE, Ste 2250
Atlanta, Georgia 30326
mitchell@mitchellmcgoughlaw.com
*Counsel for Plaintiff*